## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

JOAN PETERSON, individually,
and on behalf of the heirs and next
of kin of Frank Raymond Servantez,
Decedent,
a/k/a, Joan Petersen Servantez,
                    Plaintiff,

                                        **MEMORANDUM OF**
                                        **LAW AND ORDER**
v.                                      Civil File No. 21-01431 (MJD/LIB)

UNITED STATES OF AMERICA,
                    Defendant.

Jeffrey S. Storms, Ryan O. Vettleson, Newmark Storms Dworak, LLC, Counsel
for Plaintiff.
Friedrich A. P. Siekert, Assistant United States Attorney, Counsel for Defendant.

## I.      INTRODUCTION

This matter is before the Court on Defendant United States' ("the VA")

Motion for Summary Judgment (Doc. 59) and Plaintiff Joan Peterson's Motion

for Leave to File a Motion to Strike Defendant's Surrebuttal Expert Declarations

(Doc. 67). The Court heard oral argument on February 29, 2024 via Zoom. For

the reasons discussed below, the Court denies both motions.

## II.     FACTS

1

## A.      Frank Servantez's Personal and Medical History

This is a wrongful death case brought under the Federal Tort Claims Act

("FTCA") by the surviving spouse of Frank Servantez ("Servantez").  Servantez

was born February 11, 1945, served two tours in Vietnam, and was honorably

discharged.  (Shadur Decl. ¶ 11; Atta Decl. ¶ 12.)  He is survived by his wife, Joan

Peterson, the trustee of his estate and Plaintiff in this lawsuit; two grown

daughters; and three grandchildren.  (Id.)

### 1.      Medical History Overview

Servantez's medical history includes, in part, a history of type 2 diabetes

mellitus; hyperlipidemia; hypertension; obesity; long-time tobacco dependency

that he overcame; and chronic alcohol use until about 2013.  (Atta Decl. ¶ 13;

Shadur Decl. ¶ 12; Wolff Decl. ¶ 12.)  A January 24, 2019 coronary angiogram

revealed "60% stenosis in his mid-left anterior descending coronary artery."

(Shadur Decl. ¶ 14.)

### 2.      Kidney Disease

In January 2014, Servantez's left kidney was removed due to renal cell

carcinoma.  (Atta Decl. ¶ 14.)  On April 21, 2015, Servantez was diagnosed with

end stage renal disease ("ESRD").  (Id.)  In December 2015, he was initiated on

renal replacement therapy with hemodialysis (alternatively "dialysis").  (Shadur Decl. ¶ 13.)

Servantez was referred to the transplant program at the VA Hospital in Iowa City in 2016.  In November 2016, he had his first kidney transplant evaluation, was declined due to obesity, and weight loss was recommended. (Atta Decl. ¶ 15.)  In May 2019, he was placed on the active deceased donor waiting list.   (Id. ¶ 19; Shadur Decl. ¶ 13.)  Servantez received dialysis treatments Mondays, Wednesdays, and Fridays at the Fergus Falls Fresenius Kidney Center and his general medical care in the VA system in both Fargo, North Dakota and Fergus Falls, Minnesota.  (Shadur Decl. ¶ 15.)

### 3.    Canceled Dialysis Treatments

In July 2019, Servantez terminated several dialysis treatments early, mostly for leg cramping or restless legs.  He ended dialysis early on July 3 due to restless legs; ended treatment early for unknown reasons on July10; missed a full day of treatment on July 17 because restless leg syndrome kept him from sleeping the previous night; and missed 2 hours of dialysis on July 19 due to restless legs, which resulted in Servantez missing approximately 5.5 of his prescribed 10.5 hours of treatment that week.  (Tolins Decl. ¶¶ 16-20 (noting, inter alia, that Servantez left treatment on July 10 against medical advice ("AMA").)

3

Servantez also terminated dialysis treatments the next week: on Monday, July 22, he missed 1 hour and 23 minutes of treatment due to restless legs; on Wednesday, July 24, he terminated 1.5 hours early due to restless legs and pain and discomfort; and on Friday, July 26, he terminated dialysis 2 hours and 45 minutes early for the same reason.  On both Wednesday and Friday, he left AMA, but the Friday notation also stated, "MD aware."  Thus, Servantez again missed approximately 5.5 of 10.5 hours of weekly dialysis.  (Id. ¶¶ 21-23.)

### B.   Events of Saturday, July 27 – Monday, July 29, 2019

#### 1.   Events of July 27, 2019

On July 27, 2019, Servantez presented to the emergency department ("ED") of the Fargo Veterans Administration Health Care System ("VAHCS") complaining of shortness of breath over the previous few days.  (Id. ¶ 32; Atta Decl. ¶ 21.)  He noted that his legs felt jumpy for the previous two weeks and explained that he had to cut dialysis short and could not complete dialysis sessions the past two weeks due to restless legs.  (Tolins Decl. ¶ 32.)  He had tried a medication for restless legs the night before he came to the ED, which helped. (Atta Decl. ¶ 21.)  Servantez also explained that he had similar symptoms the previous year, was sent to Sanford Medical Center ("Sandford"), and felt better after dialysis.  (Id.)  He requested that "dialysis run be done today."  (Tolins

4

Decl. ¶ 32 (citation omitted).)  Emergency Department physician Dr. Takedo

Baba evaluated Servantez and made the following evaluation:

> hypertension, a normal heart rate, normal to mildly increased
> respiratory rates, and a normal capillary oxygen saturation. . . . un-
> labored respirations, with jugular venous distention, mild bibasilar
> rales on chest exam, and mild bilateral leg edema—consistent with
> congestive heart failure.  His note stated that Mr. Servantez denied
> chest pain. . . . Mr. Servantez's weight had increased 8 pounds over
> his baseline weight in April 2019.  His chest X-ray demonstrated
> "mild cephalization of vessels mild interlobar septal thickening.
> Small fluid in the minor fissure" which was interpreted as
> compatible with mild congestive heart failure.  Laboratory studies
> were most notable for . . . serum potassium of 5.7 mg/dl. . . .

(Shadur Decl. ¶ 16.)  Servantez's blood pressure was 189/89.  (Tolins Decl. ¶ 32.)

Servantez told the triage nurse he was on the transplant list and had

received a call that week, only to learn that the kidney was unsuitable for

transplant.  (Id. ¶ 33.)  He had tried to get short-run dialysis earlier on July 27 but

was unable to do so.  (Id.)

Dr. Baba's assessment was (1) dyspnea (shortness of breath), (2) CHF/fluid

overload, (3) hyperkalemia (high potassium), (4) history of ESRD on dialysis, and

(5) history of grade 2 diastolic dysfunction.  (Shadur Decl. ¶ 16; Wolff Decl. ¶ 13.)

Servantez was given oral kayexalate in the ED to treat the hyperkalemia, and

"intravenous furosemide . . . was ordered and administered to treat the

congestive heart failure/fluid overload."  (Id.)

5

Chief of Medicine Dr. Breton Weintraub, an internist who was covering

nephrology,[1] agreed to examine Servantez the next morning to decide about

dialysis.  (Def. Ex. K (Weintraub Dep.) at 12-13, 18, 24.)  Servantez was admitted

to his hospital floor at approximately 7:30 p.m.

Servantez had trouble sleeping during the night due to restless legs and

the feeling of fluid overload.  He received melatonin and 0.125 mg of

pramipexole at 11:30 p.m. but felt more restless.  He was administered Tylenol

and hydroxyzine around 12:45 a.m. and Clonazepam at 1:30 a.m.  (Tolins Decl. ¶

37.)  At 2:00 a.m., Servantez felt restless and short of breath and requested a

transfer to Sandford for dialysis, stating, "I feel fluid overload, I want to be

transferred out or I am calling my wife."  (Id. (quoting Def. Ex. A (nursing note)

at 154).)  Servantez received one mg of Ativan by IV at 2:24 a.m.  (Id.)

### 2.    Events of July 28, 2019

Dr. Weintraub examined Servantez on July 28.  In a 13:14:24 treatment

note, Dr. Weintraub stated the following:

> Mr. Servantez came to the ED yesterday with . . . dyspnea
> prompting admission.  Oxygenation has been good on [room air.]

---

[1] At the time that Servantz was admitted, the VAHCS was "in a transition" in its
nephrology staff after one of its nephrologists had moved away and another
nephrologist was unable to be on call.  (Weintraub Dep. at 21-22.)

Weight is up roughly 8# from baseline.  Appetite is decreased but he denies nausea.  Modest edema noted per patient.  Last evening, he had difficulty sleeping due to severe restlessness and dyspnea. The symptoms were managed with benzodiazepines with success although today he is sleepy.  Currently he thinks his breathing is back to baseline.

.   .   .   .

BP 167/ 82 on 07/28/2019 at 11:31, pulse 77/m, weight 225.8 lb. (102.6 kg) at 07/27/2019 at 19:53, Temp 98.5. . . . trace edema in his extremities.  No indications for emergent dialysis at this time. Will dialyze MWF.  He also noted that volume status modestly up, okay to manage with furosemide but would not pursue vigorously. Other "lytes" [electrolytes] okay at present.

(Atta Decl. ¶ 28 (citation omitted) (paragraph break added) (first set of brackets added).)

### 3.   Events of July 29, 2019

Servantez was scheduled for dialysis at 8:00 a.m. on Monday, July 29, his regular dialysis day.  RN Dana J. Ottmar took over for the nightshift nurse at 7:10 a.m. and "administered 5mg IV Hydralazine for BP 184/72."  (Def. Ex. B (Hashbarger treatment note) at 387).)  RN Ottmar's notes state the following:

While administering [Hydarlazine,] patient c/o feeling sweety [sic] and hot.  Temperature taken at 0703 . . . . Cool wash cloth provided per request.  Patient then states he is going to vomit.  Sat patient up in bed and handed him an emesis bag.  Night nurse Deqa, RN notified and requested her to notify the Doctor.  Dr Castilla notified. Called lab and asked them to draw patients labs.  They report difficult stick.  Patient denied chest pain or SOB [shortness of breath].  4Mg IV Ondansetron administered at 0725 per this author.

> Called dialysis asking to transfer patient over to get labs drawn
> offline and start dialysis. Notified dialysis nurse Amy RN of patient
> symptoms.  Dr. Murat of patient symptoms.

(Id. (first set of brackets in original).)

At 7:35 a.m., Dr. Murat and RN Ottmar transferred Servantez to a wheelchair without difficulty and escorted him to dialysis where a report was given to RN Justin Hashbarger and the primary nurse.  (Id.)

At 7:45 a.m., RN Hashbarger documented that Servantez was visibly sweating, holding an emesis bag, and had two episodes of dry heaving before asking to use the bathroom and being accompanied to a public restroom by another nurse where he voided a small amount of urine and had a loose stool. (Id. at 388.)  When he returned to the dialysis unit, RN Hashbarger took Servantez's vitals: Servantez was oriented x4; BP: 113/73; temperature: 97.6; and his lung sounds were clear bilaterally.  (Id.)  Blood was drawn prior to starting dialysis and Servantez's potassium level was 4.8 mg/dl, which was within normal range, although this was not known until hours later.  (Wolff Decl. ¶ 16.)

Dialysis began at 8:15 a.m.  (Def. Ex. B (Hashbarger treatment note) at 388.) Servantez's blood pressure at the start of treatment was 78/56.  (Id.)  Servantez was "awake and talking."  (Id.)  Ultrafiltration was stopped, although no fluid was "pulled off," and a repeat blood pressure remained low at 77/58.  (Id.)  "An

8

IV bolus 200ml of 0.9% Sodium Chloride was immediately given and Albumin

25% 50ml was given through the dialysis access."  (Id.)  At 8:18 a.m., Servantez's

blood pressure was 70/48, he became unresponsive to voice or sternal rub, was

having agonal breathing (gasping for air), and had no palpable pulse.  (Id.)

"Code blue was initiated, crash cart and defibrillation pads were placed, CPR

was started."  (Id.)

> The initial rhythm noted in the code log was pulseless electrical activity (PEA).  In addition to CPR, intubation, and mechanical ventilation, Mr. Servantez received a total of 19 mg of intravenous epinephrine, 7 ampules of sodium bicarbonate, 3 ampules of calcium chloride, 300 mg of intravenous amiodarone, and he was placed on intravenous infusions of amiodarone, norepinephrine and phenylephrine during the prolonged resuscitative effort.  He also received 10 units of insulin and an ampule of 50% dextrose twice, initially to empirically treat him for hyperkalemia since the results of the 8:10 AM blood tests had not returned, and later in the resuscitative effort when a 9:00 a.m. blood test resulted in a serum potassium elevated at 6.3.  He briefly regained a pulse associated with a wide-complex, "agonal" rhythm, and was transferred to the ICU, but this quickly degenerated again to pulseless electrical activity requiring reinstitution of CPR and additional pharmacologic therapy.  After these additional resuscitative efforts proved unsuccessful, and at the request of the family, the Fargo VA providers terminated the code. . . .

(Shadur Decl. ¶ 21; Tolins Decl. ¶¶ 45-47.)  Servantez was pronounced dead at

10:20 a.m. from pulseless electrical activity cardiac arrest.  (Def. Ex. A at 105-06

(Respiratory Therapy Consult N. & Dr. Murat Summ. of Death N.).)  His family

declined permission for an autopsy.

> Cardiac arrest, also known as sudden cardiac arrest, is when the
> heart stops beating suddenly.  The lack of blood flow to the brain
> and other organs can cause a person to lose consciousness, become
> disabled, or die if not treated immediately.  Pulseless electrical
> activity ("PEA") is a form of cardiac arrest in which the
> electrocardiogram shows a heart rhythm that should produce a
> pulse, but does not.

(Doc. 76 at 12 nn. 2-3 (cleaned up) (citations omitted).)

Additional facts will be discussed as necessary.

## III.    DISCUSSION

### A.    The Federal Tort Claims Act ("the FTCA")

> The FTCA waives federal sovereign immunity and grants federal
> district courts jurisdiction over a certain category of claims against
> the United States only to the extent that a private person, under like
> circumstances, would be liable to the plaintiff under the substantive
> law of the state where the alleged wrongful conduct took place. . . .
> Thus, to state a claim that is cognizable under the FTCA, a claim
> against the government must have a "private analogue"; in other
> words, the claim must be such that a similarly situated private party
> would be liable for the same conduct in [North Dakota].

Green Acres Enters., Inc. v. United States, 418 F.3d 852, 856 (8th Cir. 2005)

(citations omitted); see also 28 U.S.C. § 1346(b)(1).

B.      **Exhaustion of Administrative Remedies**

Under the FTCA, a plaintiff must exhaust administrative remedies before

bringing an action against the United States.  28 U.S.C. § 2675(a); Flores v. United

States, 689 F.3d 894, 901 (8th Cir. 2012) (citations omitted).

In this case, Plaintiff was appointed trustee for Servantez's heirs and next

of kin in the District Court for Otter Tail County, Minnesota on December 20,

2019.  (Second Am. Compl. ("Compl.") ¶ 2.)  "Plaintiff timely submitted her

FTCA claim, Standard Form 95 and exhibits thereto, and receipt was

acknowledged on August 27, 2020," but at the time Plaintiff filed the Second

Amended Complaint, the VA had yet to accept or deny her claim.  (Id. ¶¶ 8-9.)

The VA now states that it denied the claim by letter on August 4, 2022, almost

two years after she submitted her FTCA claim.  (Doc. 64 at 7.)

"The failure of an agency to make final disposition of a claim within six

months after it is filed shall, at the option of the claimant any time thereafter, be

deemed a final denial of the claim for purposes of this section."  28 U.S.C.

§ 2675(a); see also Askar v. Hennepin Cnty., 600 F. Supp. 3d 948, 952 (D. Minn.

2022); Poitra v. United States, No. 4:09-CV-048, 2011 WL 1311729, at *4 (D.N.D.

Apr. 4, 2011) (holding that a claim has been properly presented to the agency and

therefore the court has jurisdiction "if the cause of action is fairly implicit in the

11

facts set forth in the administrative claim").  Thus, the Court finds that Plaintiff

has exhausted her administrative remedies and the Court has jurisdiction over

this matter.

>   **C.     Motion for Leave to File a Motion to Strike the VA's Surrebuttal
>           Expert Declarations**

The Third Amended Pretrial Scheduling Order in this case ("the Order")

established the following schedule for expert disclosures:

> The Plaintiff's disclosures shall be made on or before April 5, 2023.
> The Defendants' disclosures shall be made on or before June 5, 2023.
> If Plaintiff has any rebuttal disclosures limited to addressing
> Defendants' disclosures, such rebuttal disclosures shall be made on
> or before July 5, 2023.

(Doc. 49 at 4.)  Although the Order does not mention surrebuttals, Paragraph IX

of the Order states, "[E]ach party shall fully supplement all discovery responses

according to Rule 26(e), Federal Rules of Civil Procedure."  In turn, Rule 26(e)(2)

provides that "[a]ny additions or changes to . . . [expert reports] must be

disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are

due."  The Parties' pretrial disclosures will not be due until the Court files a

pretrial notice.  Under the Order, all dispositive motion papers were due by

September 30, 2023, the date upon which the VA filed its motion for summary

judgment and attached the surrebuttal declarations of its expert physicians along with the rest of its exhibits.

### 1.    The Parties' Arguments

Plaintiff argues that the VA did not seek permission to file the surrebuttal declarations of its expert physicians that it included as support for its motion for summary judgment.  (Doc. 69 at 2.)  Plaintiff asserts that although the admission of expert testimony lies within the broad discretion of the Court, an extension of the time for a party to act can only be granted upon a finding of good cause based on a proper motion if the time to act has already passed.  (Id. (citations omitted).)  Plaintiff argues that because the VA filed its surrebuttal declarations on the date that dispositive motions were due, Plaintiff has the right to seek leave to ask the Court to strike the declarations.  (Id. at 3.)

Plaintiff states that the scenario here is exactly like the scenario in Consultus, LLC v. CPC Commodities, No. 19-cv-00821-FJG, 2023 WL 5827222, at *8 (W.D. Mo. Mar. 29, 2023), in which the court struck a surrebuttal report that was not provided for in the scheduling order and filed after the close of discovery and without leave of the court.  (Id.)

In response, the VA argues that the Order did not prohibit surrebuttal expert declarations and directed the Parties to supplement all discovery

13

responses according to Fed. R. Civ. P. 26(e).  (Doc. 74 at 2 (citing the Order ¶ IX).)

The VA notes that the Order required all dispositive motion papers be filed by

September 30, 2023.  The VA argues that the submissions were timely because

the timeline in the Order for submitting supplemental expert reports is Rule

26(e), which provides, "Any additions or changes to . . . [expert reports] must be

disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due"

and no trial notice has yet been issued in this case.  (Id. at 3 (brackets in

original).)

## 2.    Analysis

"Decisions concerning the admission of expert testimony lie within the

broad discretion of the trial court, and these decisions will not be disturbed on

appeal absent an abuse of that discretion."  Nebraska Plastics, Inc. v. Holland

Colors Ams., Inc., 408 F.3d 410, 415 (8th Cir. 2005) (quotation omitted).  Here, the

Court's decision comes down to how broadly it reads the Order.  Plaintiff is

correct as far as she goes: there is no provision in the Order that specifically

provides for the VA's expert surrebuttals.  However, the VA is also correct that

all dispositive motion papers were due by September 30 and that Rule 26(e)

provides that changes to expert reports must be disclosed by the time pretrial

disclosures are due under Rule 26(a)(3).  No pretrial order has yet been issued.

14

Therefore, it seems that the problem is that the Order is open to two different legitimate interpretations.  <u>Consultus</u>, the case cited by Plaintiff, says nothing about the scheduling order except that it did not provide for a surrebuttal expert report and that the surrebuttal at issue was filed after the discovery deadline.  2023 WL 5827222, at *8.  Here, there were other discovery deadlines that appear to allow for filing the surrebuttals, albeit only after a thorough reading of the Order.  In addition, the surrebuttal report in <u>Consultus</u> included "numerous new opinions, and extensive new analysis . . . unrelated to [the expert's] original opinions."  <u>Id.</u>  The surrebuttal declarations in this case do not include new opinions or new analyses, but merely expand on the experts' original opinions to explain what they see as weaknesses in Dr. Tolins's Reply Declaration.  (<u>See</u> Atta Surrebuttal Decl. ¶¶ 6-14; Shadur Surrebuttal Decl. ¶¶ 7-28; Wolff Surrebuttal Decl. ¶¶ 7-10.)  In fact, the surrebuttals are rather redundant of the original VA expert declarations.

Moreover, although styled as a motion for leave to file a motion to strike surrebuttal expert declarations, the Court finds that this is an actual motion and supporting memorandum of law to strike the declarations.  Courts in this District, including this one, have questioned the authority for filing such a

motion.  See Evans ex rel. Evans v. Krook, No. 20-CV-2474 (MJD/ECW), 2023 WL
4373915, at *16 (D. Minn. July 6, 2023) (citing Carlson Mktg. Grp., Inc. v. Royal
Indem. Co., No. 04-CV-3368, 2006 WL 2917173, at *2 (D. Minn. Oct. 11, 2006)).)
For this and the other reasons expressed above, the Court denies the motion.

### D.     The VA's Motion for Summary Judgment

The VA argues that with discovery completed in this case and expert
declarations submitted, Plaintiff cannot establish her prima facie case of
professional negligence.  Therefore, according to the VA, the Court must grant it
summary judgment and dismiss this case with prejudice.

### 1.     Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in the light most
favorable to the non-moving party, there is no genuine dispute as to any material
fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ.
P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The party seeking
summary judgment bears the burden of showing that there is no disputed issue
of material fact.  Celotex, 477 U.S. at 323.  "A dispute is genuine if the evidence is
such that it could cause a reasonable jury to return a verdict for either party; a
fact is material if its resolution affects the outcome of the case."  Amini v. City of

Minneapolis, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248, 252 (1986)).

### 2. North Dakota Substantive Law Applies to This Case

The Parties agree that North Dakota substantive law applies to this case.

See Shanner v. United States, 998 F.3d 822, 825 (8th Cir. 2021) ("When analyzing

actions brought under the FTCA, courts apply the substantive law of the state in

which the events giving rise to the complaint occurred."); Gipp v. Webb, No.

1:19-CV-00213, 2024 WL 278214, at *4 (D.N.D. Jan. 25, 2024) (same).  In North

Dakota, "summary judgment is usually inappropriate for negligence claims

because negligence claims involve questions of fact; however, summary

judgment will be deemed appropriate when the evidence is such that a

reasonable factfinder can reach only one conclusion."  Johnson v. Mid Dakota

Clinic, P.C., 864 N.W.2d 269, 274 (quotation omitted).

### 3. Whether Plaintiff Can Establish Her Prima Facie Case of Professional Negligence

Plaintiff has the burden to prove her prima facie case of professional

negligence against the VA.  Plaintiff has provided two expert declarations from

Dr. Jonathan P. Tolins, a nephrologist who has practiced medicine in the

Minneapolis/St. Paul area since 1983.  (Tolins Decl. ¶ 5.)  Dr. Tolins completed his

internship and residency in Internal Medicine at the University of Minnesota

School of Medicine and then completed a fellowship in Nephrology at the

University of Minnesota School of Medicine from 1983-1986.  (Id. ¶ 4.)  Dr. Tolins

served on the faculty of the University of Minnesota School of Medicine from

1986 to 1998 with a final rank of tenured Associate Professor of Medicine.  (Id. ¶

5.)  From 1986 to 1997, he was also a staff nephrologist at the Minneapolis VA

Medical Center.  (Id.)  He has been in private nephrology practice with InterMed

Consultants since 1997, is licensed by the states of Minnesota and Montana, and

is certified by the American Board of Internal Medicine and the American Board

of Nephrology.  (Id.)

> To establish a prima facie case of professional negligence, a plaintiff
> must produce expert evidence establishing [1] the applicable
> standard of care, [2] violation of that standard, and [3] a causal
> relationship between the violation and the harm complained of.
> [H]owever, expert testimony is not required to establish a duty if the
> breach is so egregious that a layman is capable of comprehending its
> enormity.  This obvious occurrence exception applies only to cases
> that are plainly within the knowledge of a layperson.

Johnson, 864 N.W.2d at 273 (citations omitted); Greenwood v. Paracelsus Health

Corp. of N.D., 622 N.W.2d 195, 199 (N.D. 2001).

The Parties agree this is not an "obvious occurrence case" and that expert

testimony is required to establish "the degree of care and skill required . . . and

18

whether specified acts [fell] below that standard of care." <u>Greenwood</u>, 622

N.W.2d at 200 (citing <u>Heimer v. Privratsky</u>, 434 N.W.2d 357, 359 (N.D. 1989)).

Fact issues exist on the element of causation, which makes summary

judgment inappropriate in this case, even if the Court assumes fact issues do not

exist on the other two elements.

"A proximate cause is a cause which, as a natural and continuous

sequence, unbroken by any controlling intervening cause, produces the injury,

and without which it would not have occurred." <u>Johnson</u>, 864 N.W.2d at 275

(cleaned up) (citations omitted). "The term 'proximate cause' strictly

contemplates 'an immediate cause which in natural and probable sequence

produces the injury complained of' and expressly excludes any assignment of

legal liability 'based on speculative possibilities, or circumstances and conditions

remotely connected with the events leading up to the injury.'" <u>Id.</u> (quoting

<u>Moum v. Maercklein</u>, 201 N.W.2d 399, 403–04 (N.D. 1972); <u>Frank v. Mercer Cnty.</u>,

186 N.W.2d 439, 446 (N.D. 1971) ("damage must be direct and proximate and not

merely such as is possible, as may be conceived by the imagination. . . .")).

Causation is a question of fact. <u>See</u> <u>Miller v. Trinity Med. Ctr.</u>, 260 N.W.2d 4, 6

(N.D. 1977).

Plaintiff argues that Servantez's cardiac arrest "was directly caused by the failure to timely dialyze Mr. Servantez, which resulted in a fluid overload and congestive heart failure."  (Doc. 65 at 17 (citing Tolins Decl. ¶¶ 48, 54; Tolins Reply Decl. ¶ 12).)  Plaintiff further notes that Dr. Tolins opined that Dr. Weintraub's failure to schedule Servantez for dialysis until Monday "caused Servantez's death (i.e., a PEA cardia arrest)."  (Id.)  At oral argument, Plaintiff asserted that looking at the case in the light most favorable to her and giving her the benefit of all reasonable inferences, she has stated a prima facie case of causation and that under Greenwood, 622 N.W.2d at 201, that is sufficient to survive summary judgment.

The VA responds that Dr. Tolins fails to establish a causal link from a failure to dialyze Servantez on July 27 or 28 to Servantez's PEA cardiac arrest July 29 because he fails to "explain the manner in which the alleged failure to dialyze . . . Servantez on Sunday caused or contributed to his death on Monday, July 29, 2019 from what was indisputable PEA cardiac arrest."  (Doc. 64 at 22.)  The VA explains that both cardiac arrest and PEA cardiac arrest can be described as "electrical phenomena [that] require a triggering event."  (Doc. 76 at 12.)  The VA argues that the only direct event that might be related to a failure to dialyze

is hyperkalemia because if a potassium level is high enough, "it is known to be

such a triggering event." (Id.)  Dialysis removes potassium. (Id.)  In this case,

however, hyperkalemia can be removed with certainty because by the time

Servantez's blood was drawn at 8:10 a.m. on July 29, his potassium was 4.8,

which was well below the threshold for normal, which is 5.1. (Id. (citing Wolff

Decl. ¶ 22; Wolff Surrebuttal Decl. ¶ 9; Shadur Decl. ¶ 37; Shadur Surrebuttal

Decl. ¶ 11; Atta Decl. ¶¶ 30, 34, 35; Atta Surrebuttal Decl. ¶ 11).)  As the VA

stated at oral argument, at trial, Dr. Tolins cannot get over that he ignores the

normal potassium reading.

     While the VA proffers other arguments it states support the conclusion

that Servantez did not die due to failure to dialyze prior to July 29, the

arguments all amount to "a battle of the experts."  As Plaintiff noted at oral

argument, this case involves questions of fact and the Court must weigh the

evidence, weigh the credibility of witnesses, and render judgment after a bench

trial.  See Johnson, 864 N.W.2d at 274 ("summary judgment is usually

inappropriate for negligence claims because negligence claims involve questions

of fact . . .")

     The Court agrees.

IV.    **ORDER**

Based on all the files, records, and proceedings herein, the Court hereby

**ORDERS** the following:

1.     Defendant's Motion for Summary Judgment **[Doc. 59]** is **DENIED**;

       and

2.     Plaintiff's Motion for Leave to File a Motion to Strike Defendant's
       Surrebuttal Expert Declarations **[Doc. 67]** is **DENIED**.

Dated:  March 27, 2024                    s/Michael J. Davis
                                          Michael J. Davis
                                          United States District Court